The next case on the calendar is Kilgour v. SEC. Good morning. May it please the court, my name is Colin Kilgour. I'm here to provide oral arguments in support of myself and Daniel Williams who's beside me here. This case really boils down to four key things. First, we cracked the case against Deutsche Bank. Without our support, there are no whistleblower awards, period. Two, we are eligible whistleblowers as the original source of critical information as defined by the whistleblower rules as they are explicitly and unambiguously written. The SEC has erroneously interpreted these unambiguous rules contrary to their clear meaning to deny us an award. Their use of discretion here is incorrect and not supported by precedent. Three, we did not forfeit our precedent cited by the SEC. And lastly, our submission was key to the success of the action. Failure to acknowledge this would nullify the original source exception in the whistleblower rules. Could you address, I think it was your second, maybe third point about we were the original source of the information? Absolutely, I'm happy to do that. The denial they gave us was not based on the rules that are in place, but rather on their erroneous and subjective interpretation of the rules. Specifically, they chose to interpret the rules in a manner that's counter to the specific language in Rule 21F4, Subsection 5. They refer to it as the original source exception, which clearly states, quote, the commission will consider you to be an original source of the same information we obtained from another source if the information satisfies the definition of original information and the other source obtained the information from you or your representative. Despite this very clear rule, the SEC does not consider us to be the original source of the information we provided. They claim that the 60 key centre versus GSA precedent supports their use of discretion in doing this. And they quote, the precedent says, it's well settled that an agency's interpretation of its own regulations is of controlling weight unless it is plainly erroneous or inconsistent with the regulation. But the precedent they rely on, Your Honours, has an important qualifier, that the agency's interpretation is plainly erroneous or inconsistent with the regulation. The SEC's interpretation here is plainly erroneous and inconsistent. Rule 21F4, Subsection 5 uses the word will with regard to the original source of consideration. There's no ambiguity in the language used and the use of the definitive word will, rather than may, could or might, removes any latitude for interpretation. The SEC's interpretation is clearly inconsistent with the regulation and, therefore, Mr. Williams and I must be considered to be the original source of information. Your argument that the SEC is saying that the rule contemplates this degree of independence and so a principal and an agent, the relationship you had with your client, prohibits you, keeps you from being an original source. And your argument is that they're reading language into the regulation that's not there. That is correct. They do mention some of the things that they contemplated and there are other instances in the rules where they do contemplate specific circumstances and they lay those circumstances out. In this case, for Rule 21F4, Subsection 5, they actually use general language, which certainly includes the circumstances here. So the fact that they did not necessarily contemplate it is really not our concern. The next point I'll go on to is that the Commission wrongly claimed that we had waived our rights to be whistleblowers by initially working with Claimant No. 2. This is not true and there's nothing, again, in the rules to support their position. Looking beyond the rules, there are no contracts or agreements in place where we ceded our rights. To the contrary, we do have agreements in place with Claimant No. 2 where we have specifically preserved our rights. Instead, the SEC relies on the Hamilton v. Atlas Turner precedent to determine that we intentionally waived our rights to be whistleblowers. However, this precedent is not even remotely analogous. I take it you cannot be, there's no prospect of your being compensated by Claimant No. 2 out of what Claimant No. 2 received? We do have an agreement with Claimant No. 2, but it's not what we're talking about here. It's subject to, it has been contested by his ex-wife. And quite frankly, part of what we are doing here is we have preserved our rights as whistleblowers, not necessarily as a result of his divorce, but simply because there's really three reasons why we have chosen to go down this route, which you're probably curious about. One is, as we got through this process, the level of effort we expended greatly exceeded what was originally expected. The quality and the quantity of evidence we provided greatly exceeded what everyone expected. And thirdly, Claimant No. 2 had no capacity to pay us. He was unemployed. I take it the opposing position, and I'm sure we're going to hear what it is, but is that you did not supply this information. Essentially, you were not supplying it to the government. You were supplying it to Claimant No. 2, who supplied it to the government and was paid for it. Initially that was true. That being said, 21b-4, subsection 5 clearly states that the Commission is compelled to consider us to be the source of the original information, if it arrives in that way. The language is explicit and clear, and it is general enough to include our circumstance. So when they talk about the ability for the Commission to interpret its own language, interpret its own rules, that's one thing, but it cannot be plainly erroneous or inconsistent with the regulation, which is the case here. Wouldn't accepting your interpretation of the regulation create an incentive, though, outside of your case, on the part of retained experts to abandon their contracts and file whistleblower claims? That would complicate the work of the SEC in adjudicating these claims, it would seem to me. I can't comment on what future cases might be. I can say definitively that it's not the end in any claim. We did not do an end run on anybody. Everything we did was properly documented, and it was communicated to the SEC on a timely basis, well before there was any penalty against Deutsche Bank. Yes, I understand. I was just looking at the regulation and whether the interpretation you're offering of it would possibly discourage whistleblowers from engaging people like you, who assisted them in putting their claims in, for fear that the claims might result in a second whistleblower claim. To be clear, we are not in the business of providing whistleblower advice. That's not our business. I see that we have a timing issue. Yes, you wanted to reserve two minutes of rebuttal. Do you want to use that now, or  do you want to do it at the end of the day? I'll reserve it. Good morning, Your Honors. David Covell. I'm here on behalf of John Doe, the appellant. I think to give a sense of the dynamics of the case as it applies to Mr. Doe, an example is useful. And this example is one that we only have now because the record is more full on appeal. We didn't have it below in the administrative proceeding. On June 26, 2011, Claimant 2—this is the person who the SEC determined should receive an $8 million award—he provided a document to the SEC's investigators who are looking into this issue, the leveraged super senior transactions. And he described the document as follows. The document, I just found, is from a market risk meeting that took place on May 15, 2009. And it acknowledges the short option position—that's talking about LSS—and the fact that it is not modeled or priced, exclamation point. I'm not saying that it was bad conduct. And it goes on. That's in the record at JA4038. And Claimant 2 provided the document about the meeting at JA4042. There were only a few attendees at that May 15, 2009, meeting. And John Doe was one of them. Long prior to this communication by Claimant 2, which was in June 2011, Doe had provided the SEC with detailed information and documents about this conduct. It was almost a year earlier, in fact, that he first went to the SEC, and eight months before Claimant 2 had gone to the SEC. Now, Doe has been given, as the Court knows, no credit for the information he provided. The SEC intake group, the CFIU, did not forward the information to the investigators until well after Claimant 2 had come forward. And even then, when they started forwarding information, they left out some of the best information. Doe is what would be considered an exemplary whistleblower in this context. He was an eyewitness and he had documents. He complained internally at Deutsche Bank at the time in 2009. He went to the Senate's Permanent Subcommittee on Investigations and talked to them about the problem. He was believed there. He went to the Federal Reserve Bank of New York, talked to them about the problem. He was believed there. They referred him to the SEC. He went to the Financial Times, talked to reporters about the LSS problem. He was considered a reliable source there. And then he went to the DOJ and to Bundesbank to talk about Deutsche Bank. He was considered a credible witness there. All of this is in the record. And then when he— So the theory is that the information that he provided in September and October 2010, if that had been timely, passed along, that it would have—it didn't prove to be significant because by the time the right people got it, the investigation had already proceeded. But if it had been timely, passed along, it would have been significant. The theory is that the SEC engaged in affirmative misconduct in connection with both not providing—not forwarding that on when they knew there was investigation and then blaming him for some shortcoming of his when they didn't forward it on and for some shortcoming of the information. But what it's also telling is that the original information provided under our theory was useful to the SEC. The information is fungible. If you look at the statute, it talks about information. It doesn't talk about who submitted it. And there's a real policy reason to keep that information with original, not secondary. There's a good overlap here between what Claimant 5, John Doe, provided and what Claimant 2 had provided. His October submissions were beyond just not forwarding on the information. When Doe sought to bring that information and sought an award in 2015, the SEC's response was A, to provide ad hominem attacks against him—that's the Reed-Moyo Declaration—but B, to diminish the quality of what he provided, even though he provided actual documents substantiating it. But at the same time, give credit to Claimant 2 for almost identical kinds of submissions. It was a real bias that they showed, and it seemed like an ends-oriented type of decision. I'm reserving one minute, Your Honor. Your Honor, as far as I know, only high school students who are doing moot court in this courtroom know how to do that. Thank you. I should know. I was a clerk here once upon a time, I'm sure. Can I deduce from your presence that the SEC is not part of the partial government shutdown? Were it so, Your Honor, we actually are. The Anti-Deficiency Act, or the appropriations process, does not cover us. We are shut down, as our webpage sort of identifies. The court directed us to appear today, so that covers the Anti-Deficiency Act. Turning to the argument, first, I'd like to start with the first principle. Anyone who comes forward to the Commission is appreciated with any information they have. That's very important to us. That's what's critical to us, to protecting investors, protecting the capital markets. That said, when Congress in 2010 created Section 21F, our whistleblower program, Congress specified certain procedures. They directed that the Commission should specify and articulate more procedures and more standards. While we, on the one hand, appreciate anyone who comes forward, we have standards and we have procedures that have to be applied here. Now, turning to the two different sets of information from the record that they provided, they helped to provide under the guise of Claimant 2, very important information. I think that's . . . we don't dispute that, and we're very appreciative of that at the Commission. The question is, did they follow the procedures? If you look at Section 21FC2 of the statute, it says no awards shall be paid unless the procedures providing information are followed. That's the statute. And we followed that up at the Commission by creating a process, sort of an orderly process. There's a pipeline, essentially. The very first thing you have to do is you have to become a whistleblower. You do that by one of two articulated methods, filing information on our online portal, or alternatively, filing what we call a form TCR. In doing that, the very next thing you have to do to actually be eligible for an Mr. Kilgore's and Williams did not do that. In fact, when their report was submitted in June 2013, if you look at both their report and the cover letter that was attached to it, it says it's being provided in support of Claimant 2's submission. Fourteen months then transpire. The sort of noteworthy event in there is May 2014 when Claimant 2's wife receives a divorce, at which point half of the award is assigned to her. Shortly thereafter, a few months more, we are notified at the Commission that Mr. Kilgore's and Williams would . . . well, they will be whistleblowers on their own behalf. Claimant 2 has consented to that. We are advised. The information that's provided in that August 2014 documentation that would be the first time they become whistleblowers, it's the exact same information we've already been provided 14 months earlier and over the ensuing months. So that's the point when they become whistleblowers. They do provide some additional information. There's no dispute that that information actually didn't lead to the success of the action. The Commission, in looking at this, I know that there are three different articulated reasons why this fails, but I think the two most obvious and easy are our rule, our rule for led to, says it's not just you gave information and that information led to the success of a cause of action. It's that your submission, once you became a whistleblower, led to the success of it. They don't dispute that their submission had already been substantially used at that . . . their original, the information that they contributed under Claimant 2's had already been substantially used and that there just sort of was no additional benefit from their submission. The record's clear on that point. It's also clear that because the Commission has, by Congress, the statutory authority and has followed this through notice and comment rulemaking to create procedures and standards, that we can't have . . . the Commission can't have a situation that people retroactively at the last minute get to step in and change the dynamic. A is going to be the whistleblower, not B any longer, or we're going to parse it out differently. There's all kinds of statutory rights that come with and obligations on the part of the Commission that come with knowing who's a whistleblower early on, such as confidentiality protections and things that put the Commission . . . that expose the Commission to identifying people as whistleblowers. So it's entirely appropriate for the Commission to look at very well-established principles such as forfeiture, which is a failure to assert a right in a timely fashion. We have 14 months here where that did not occur. In addition, waiver. Mr. Kilgores and Williams said, and I believe this is incorrect, they said that they never let go of their rights, that this was always their information. According to their reply brief . . . in their reply brief, they expressly state that they entered into a new arrangement just before August 2014 where they, and I'm quoting, this is in the reply brief, they reacquired the property rights. That is stated two times in their reply brief. So even without this Court having to decide what I think is maybe a little bit more of the thornier issue, the sort of independence in the Commission's interpretation of original source, I think there's two very solid principles. And with that, unless the Court has questions, I'll turn to Mr. Doe. Can I just ask one question about the independence interpretation of the reg? Would we be required to give our deference to the SEC's reading in order to come to that interpretation? To be perfectly honest, I think Skidmore deference does it as well. And here's why. Because the regulation, as I know there is an ongoing case law at the Supreme Court about our deference, the reason for this is . . . it's important to note that Mr. Kilgores and Mr. Doe came to the Commission, as you said, as an agent for Claimant 2. But then they were part of his source. They were part of him. They were part and parcel. They came to the Commission as his agent and talked to the staff on multiple times. They, in conjunction with him, submitted additional materials. There is no this source and that source. They may have tried to tear out and become a separate source. Just quickly, because I know I'm running on time, I'll turn to Mr. Doe. Again, this is where the standards matter. The record is clear that none of the information that Mr. Doe provided was actually used in the successful litigation of the case, successful investigation . . . in the investigation or the litigation of the case. That's stated three times in the Freedman Declarations. While I understand and we are sympathetic with Mr. Doe's situation that he believes he provided very important information, the facts are specified in the Freedman Declaration very carefully about the quality, the extraordinary quality that Claimant 2 and Claimant 2's experts provided the Commission and how that contrasted with Doe. Furthermore, and I think this is relevant, there's a lot of focus on the September and October 2010 submission and meeting with what was a second team. It wasn't an intake team. It was a second team, a CFI unit under Mr. Reed Morrow where Doe's submission was originally assigned. They listened to Mr. Doe. In Mr. Doe's brief, I believe on page 12, he talks about the fact that it was a three-hour presentation, only thirty minutes of which even dealt with the issue in this case. There were a number of allegations against Deutsche Bank. There had been twelve different submissions by Mr. Doe over the many years about Deutsche Bank. I understand that the sensitivities that Mr. Doe feels about the description of the meeting as the staff saw it, but that description is not wholly unlike by any measure the description that Ms. Friedman on a totally separate team when she met with him in May 2013 at counsel's request provides. And that was at a time when unlike the 2010 meeting, he wasn't counseled. Even when he was counseled three years later, the meeting was disjointed. They had difficulties understanding what his concerns were. Every single time anyone looked at the information that Mr. Doe provided, they didn't feel that it was worthy of a phone call. That's a totally separate team. The allegations of impropriety here deal with the CFIU team. The fact of the matter is the other team, the team that was ultimately responsible for the covered action, never found anything here that was helpful. And one last point, so not only do we think there was no impropriety, the Supreme Court in also personnel management versus Richmond has very clearly specified that collateral estoppel where monies against the government in this type of situation are involved is not a permissible course of action. And contrary to Doe's assertion, these are monies that come out of the Treasury. If you look at Section 21FG of the Exchange Act, it says in the Treasury shall be monies that are otherwise designated for the general Treasury. And when they get into Treasury, certain types of monetary sanctions up to certain thresholds get put into a subaccount in Treasury. So there is no dispute here that Office of Personnel Management is squarely on point. Unless there are further questions, we're prepared to raise them. Thank you very much. The whistleblower program was set up to encourage and reward whistleblowers for bringing forth original critical information in support of identifying malfeasance. And then counsel went and argued against that because what he's suggesting is going to discourage whistleblowers from coming forward. He then went on to say we have standards and procedures and argued at great length that those must be followed. But the key thing that he's not following is the concept of original information, which is that Rule 21F4, subsection B5. Much of counsel's argument is in fact not codified anywhere in the rules, but in fact is made up as something as their conjecture or interpretation, not what's written down on paper and in their procedures. So he says there's no award unless you follow the rules. The next thing he talked about was the reacquiring IP, as if that was the     some gotcha moment. Obviously when you enter into a contract, there's an IP aspect to that. We do not reacquire our rights as whistleblowers. We never gave up our right as whistleblowers. But obviously you need to make sure you're confirming your intellectual property rights, which we have done. We've done that with contracts, which are bog standard contracts. So yes, we reacquired the IP. We never forgave or gave up our right as whistleblower. Then he gets into this semantic argument about our submission not contributing to the case. Well, the only way you can arrive at the conclusion that our submission didn't contribute to the case is if you accept their interpretation that we are not the original source of the information we provided. If you accept the conclusion that we are the original source of the information we provided, then you can argue that our submission not only contributed to the case, cracked the case. Thank you. Your Honors, Counsel for the SEC mentioned Office of Personnel Management. Regardless of whether the Investor Protection Fund is within the Treasury, the SEC does not argue it doesn't have discretion to give him a ward. It's authorized by statute. They have never made this argument that it's not authorized by statute, that they're prohibited. In fact, I think they would argue that they have the discretion. So I don't think Office of Personnel Management applies. The ad hominem attacks on John Doe continue. The SEC seems to be the only agency that didn't find him credible. As to the other team who interviewed him in the past, I think they would argue that he was not credible. The SEC's ad hominem says he wasn't credible. He is credible and he had documents to show it and he was an eyewitness. If they had read his resume, they would have known that he was credible. More to the point, Mr. Doe had submitted a TCR. He had gotten a TCR number and the SEC, after the Madoff scandal, created this whole system with TCR numbers to route the information to the right people. It didn't get routed to the right people here until after. Amy Friedman's declaration is clear. She didn't care at that point. She already had claimant 2. The original information was Mr. Doe's. Thank you. Thank you all. Nicely argued. And thank you to the SEC for coming in. We will take the matter under advisement. That's the last case on the calendar for this morning. I will ask the clerk to adjourn court.